# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JONATHON FISK

    *Plaintiff*,

*v.*                         CASE NO. 2:13–CV–13281–GCS–PTM

COMMISSIONER OF            DISTRICT JUDGE GEORGE CARAM STEEH
SOCIAL SECURITY,           MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant*.

_____/

## <u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>[1]

## I. <u>RECOMMENDATION</u>

      In light of the entire record in this case, I suggest that substantial evidence supports the

Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS**

**RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that

Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the

Commissioner be **AFFIRMED**.

## II. <u>REPORT</u>

### A. **Introduction and Procedural History**

      This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. §

636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), by Notice of Reference to review the Commissioner's

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 8, 13.)

Plaintiff Jonathon Fisk was fifty-one at the time of the most recent administrative hearing on November 10, 2011. (Transcript, Doc. 6 at 34, 130.) Plaintiff worked for almost fourteen years as a retail store manager for a tool company. (Tr. at 60, 162.) Plaintiff filed the present claim on August 30, 2010, alleging that he became unable to work on September 22, 2004. (Tr. at 130.) The claim was denied at the initial administrative stages. (Tr. at 69.) In denying Plaintiff's claims, the Commissioner considered disorders of back, discogenic and degenerative. (*Id*.) On November 10, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Kevin W. Fallis, who considered the application for benefits *de novo*. (Tr. at 17-68.) In a decision dated January 13, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 28-29.) On January 24, 2012, Plaintiff requested a review of this decision. (Tr. at 15-16.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on May 30, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On July 31, 2013, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1 at 1.)

**B.      Standard of Review**

Congress established, through the Social Security Act and its subsequent amendments, a statutory right for those who establish that they are disabled to collect disability benefits. 42 U.S.C. §§ 301-1397. At the same time, Congress established the Social Security Administration and gave it (1) adjudicative power "to administer the old-age, survivors, and disability

insurance[,] . . . and the supplemental security income program[s]" under 42 U.S.C. § 901, and (2) rulemaking power, subject to rulemaking procedures, for the Commissioner to "prescribe such rules and regulations" when they are determined to be "necessary or appropriate to carry out the functions of the Administration" under 42 U.S.C. § 902. Therefore, the Social Security Administration ("the Agency") makes factual determinations about when a person qualifies for disability benefits and also establishes regulations to guide the administration of benefits.

The Agency has promulgated the following rules[2] for the administration of its disability insurance benefits. 20 C.F.R. 401-422. First, a state agency, "acting under the authority and supervision of the Agency," usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503;  *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If a claimant is denied, he or she may seek review of the state's decision with the Agency's three stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered *de novo* by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after exhausting the Agency's administrative remedies, that is, after the Commissioner has issued a final administrative decision that is unfavorable, may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

---

[2] The federal judiciary's review of the Agency's promulgated regulations is limited to ensuring the rules do not exceed the authority given to the Agency by Congress and that they are not arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 528 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105.

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review since we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive

notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record before the ALJ only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that

either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

### C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work . . . ." *Jones*, 336 F.3d at 474, *cited with approval in Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional

capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.    ALJ Findings**

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2009 and had not engaged in substantial gainful activity since September, 2004, the alleged onset date. (Tr. at 20-21.) At step two, the ALJ found that Plaintiff's degenerative disc disease, status/post fusion of the lower spine, and obesity were "severe" within the meaning of 20 C.F.R. § 404.1520. (Tr. at 22.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 23-24.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 27.) The ALJ also found that at the alleged onset Plaintiff fell into the "younger individual," range of 18-44 because he was forty-four years old. (Tr. at 27.) The ALJ also noted that Plaintiff has fallen out of the "younger individual category and that he was forty-nine on the date last insured. (Tr. at 27.) At step five, the ALJ found that Plaintiff could perform sedentary work. (Tr. at 27.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 28-29.)

**E.    Administrative Record**

**1.    Medical History**

On May 12, 2004 Plaintiff had a back surgery to treat his "severe back and left sided leg pain," which had "failed conservative therapy. (Tr. at 182-84.) Dr. Lisa Guyot was the attending physician for the procedure, which consisted of "an L5-S1 decompression, interbody fusion and pedicle screws." (*Id.*) Dr. Guyot submitted treatment records from December 23,

2003 to March 15, 2005 for the treatment of Plaintiff concerning this surgery. (Tr. at 181-193.) According to Dr. Guyot, Plaintiff "tolerated the procedure well and was taken to recovery in stable condition." (Tr. at 184.)

At his June 8, 2004 postoperative visit, Dr. Guyot reviewed Plaintiff's x-rays which showed the screws and rods in "good position," she assessed Plaintiff as being able to "slowly ambulate" and being "mildly antalgic," and she assessed his lower extremity strength and sensation as both fives out of five. (Tr. at 182.) She also noted that Plaintiff had previously been having pain in his left leg but it had "completely resolved," that he remained on OxyContin, and that Dr. Atty intended to "begin weaning him off" sixty days after the surgery. (*Id.*) She expected that Plaintiff would follow up with her about physical therapy in four weeks. (*Id.*)

Plaintiff did not follow up with Dr. Guyot until March 15, 2005. (Tr. at 181.) At this visit, he reported that for the last six months he had been having "terrible" intermittent back pain which would go down his left leg into the lateral calf to the top of his foot. (*Id.*) Plaintiff described this pain as worse than the pain he was experiencing before his surgery. (*Id.*) Dr. Guyot hoped Plaintiff would get a CAT scan since Plaintiff's claustrophobia had caused him to interrupt his MRI before a complete exam was taken. (*Id.*); (Tr. at 187.) Dr. Guyot noted that Plaintiff was taking OxyContin, Neurontin, Zoloft, and Flexeril for his pain. (Tr. at 181.) She also did "not [currently] feel any surgical intervention would be of benefit to him." (Tr. at 181.)

On July 4, 2005, Plaintiff went to Gensys Regional Medical Center in "severe distress" complaining of "severe" pain and chest pain and pressure. (Tr. at 212-13.) Plaintiff was given Morphine, Dilaudid, NTG, ASA, Norflex, Toradol, and Lovenox and was told to follow up.

(*Id.*) The clinical impression from this visit was "acute back pain, unstable angina, and Leukocytosis. (*Id.*) He went to Genesys Regional Medical Center again on July 30, 2005 complaining of "[l]ow back pain radiating to the left leg," and saw Dr. James Culver. (Tr. at 207-08.) At this visit Plaintiff stated that his pain was worse than it had been before his surgery. (*Id.*) Dr. Culver examined Plaintiff and reported that he "ambulate[d] unassisted but ha[d] a left sided limp and an antalgic gait," that he could walk on his tiptoes and heels but that it appeared to cause a great deal of pain, and his lumbar mobility was "reduced to flexion and extension. (*Id.*) He also noted that a "straight leg raising is positive." (*Id.*) Dr. Culver's impression was "[l]eft sciatica," "[p]ost laminectomy syndrome," and "[l]eft L5 radiculitis. (*Id.*) His plan was a series of steroid injections. (*Id.*)

Dr. Ed Atty submitted treatment records for the following visits: Approximately monthly treatments from January 19, 2004 to November 22, 2004, (Tr. at 266-81); October 25, 2005, (Tr. at 282); approximately monthly visits from September 13, 2007 to August 3, 2010, (Tr. at 282-356.)

On January 19, 2004 Dr. Atty performed a general exam and reported that Plaintiff was "in no acute distress," that his vital signs were "stable," that he was "neurologically–[a]lert, oriented, appropriate," that his "[l]umbar motion [was] still limited," and that there was "[n]o change in lower extremity strength, reflexes, [or] sensation." Dr. Atty reported the impression of "[c]hronic lower back pain secondary to left S1 radiculopathy." (Tr. at 266.) He noted that Plaintiff was having difficulty sleeping and that the lower back and left leg pain were limiting his activity. (*Id.*) At this visit, Dr. Atty laid out the following treatment plan: (1) continue taking Oxycontin, (2) continue taking Tylox, (3) continue taking Neurontin, (4) continue taking

10

Zoloft, (5) continue taking Halcion, and (6) follow up in one month "for further treatment." (*Id.*)

Plaintiff followed up with Dr. Atty on February 18, 2004; Dr. Atty performed a general exam with the same result and a musculoskeletal examination finding lumbar motion "very limited." (Tr. at 267.) There was "[N]o change in lower extremity strength, reflexes or sensation," and Dr. Atty's impression at this visit did not change. (*Id.*) The treatment plan from this visit was to increase Oxycontin, discontinue the Tylox, and to "[m]aintain other medications and follow up . . . in one month." (*Id.*) Dr. Atty noted that the Oxycontin "does not seem to be lasting long enough and the Tylox does not seem to be helping." (*Id.*) Dr. Atty also noted that Plaintiff "has been working more recently," and that he is anticipating back surgery as long as his blood work is normal. (*Id.*)

At his next visit on March 15, 2004, Plaintiff "noticed some improvement in his pain control with the increase in Oxycontin . . . and he seem[ed] to be sleeping well. (*Id.*) He only reported needing to take Halcion occasionally, and was experiencing no side effects with any of his other medicine. (*Id.*) Dr. Atty noted no acute distress, stable vital signs, and "[n]eurologically–alert, oriented" for Plaintiff's physical exam. (*Id.*) He also noted "[n]o significant change in lumbar motion or lower extremity strength, reflexes or sensation." (*Id.*) His impression did not change and his treatment plan was to continue the Oxycontin, Neurontin, Zoloft, and Halcion and to "[f]ollow up with the neurosurgeon, and follow up with us in one month." (*Id.*) Plaintiff's visit with Dr. Atty on April 5, 2004 was the same. (Tr. at 270.) On his May 10, 2004 visit, Plaintiff expressed an increase in his back and left leg pain and in his problems sleeping. (Tr. at 272.) In the general examination there was "no acute

distress," his "[v]ital signs were stable," his "[l]umbar motion [was] significantly limited," there was "[p]ositive straight leg raising on the left leg." (*Id.*)  Otherwise, there was "no change in strength, reflexes, or sensation," and his gait was antalgic. (*Id.*) Dr. Atty noted that Plaintiff would be having surgery that Wednesday, and his impression and treatment plan remained the same. (*Id.*)

Plaintiff's first visit with Dr. Atty after his surgery was on June 2, 2004. (Tr. at 273.) Dr. Atty noted that Plaintiff was wearing a Hart brace, that he was "still noticing some of the left leg pain," that there was "[n]o change in strength, reflexes or sensation," that Plaintiff "initially had some swelling in the lower extremities after surgery which ha[d] improved, that he was tolerating his medication, and that he had been given Vicodin by Dr. Guyot and was tolerating it. (*Id.*) Dr. Atty's physical examination showed "no acute distress," stable vital signs, that the "[l]umbar incisions seem[ed] to be well healed," that there was "[n]o tenderness or redness," that there was "[n]o change in lower extremity strength, reflexes, or sensation," and that Plaintiff was "[a]mbulating with a cane." (*Id.*) Dr. Atty's impression was "[c]hronic lower back pain secondary to left S1 radiculopathy, status post lumbar decompression and fusion on 5/14/2004." (*Id.*) His treatment plan was to continue the Oxycontin and other medication, to follow up with Dr. Guyot, and to "[f]ollow up with us in one month." (*Id.*)

On his June 30, 2004 visit, Plaintiff was "noticing some progress with his pain[;] especially in the left leg[] it [was] much better." (Tr. at 275.) He continued to wear the brace and was holding off on Physical therapy. (*Id.*) He was "working anywhere from eight to ten hours a day," but not doing any lifting. (*Id.*) He seemed to be sleeping better and denied any new symptoms. (*Id.*) Dr. Atty reported "[n]o acute distress," stable vital signs, no change in

lower extremity exam, and that he was still ambulating with a cane. (*Id.*) Dr. Atty's impression and treatment plan were the same as the previous visit. (*Id.*) On his July 26, 2004 visit with Dr. Atty, Plaintiff was still wearing his brace, intended to follow up with Dr. Guyot soon, had recently started to notice some increase in pain in his lower back and left leg, but noted that he had discontinued the Neurontin. (Tr. at 276.) He also noted that he had not been sleeping very well at night. (*Id.*) He continued to take the Oxycontin. (*Id.*)  He also mentioned that he planned to sell his business and that might relieve some of the stress on his back. (*Id.*) There were no changes in the results of the general examination or Dr. Atty's impression. (*Id.*) The only difference in the treatment plan was the addition of Halcion to Plaintiff's medications. (*Id.*) At his August 23, 2004, Plaintiff "seem[ed] to be doing well overall," had increased "pain in his left leg but [had] been working more recently to sell his business," he continued to wear the brace, was "doing a limited exercise program," was tolerating his medications, and planned on seeing Dr. Guyot soon. (*Id.*) There was no change in the general examination or Dr. Atty's impression. (*Id.*) The treatment plan remained the same except Dr. Atty added that he should continue the home exercise program and follow up in one month. (*Id.*)

At Plaintiff's September 20, 2004 appointment, Dr. Atty noted that Plaintiff had weaned himself off the Oxycontin and was suffering withdrawal. (Tr. at 278.) At this time, Plaintiff was taking four to six Vicodin tablets per day, was still wearing his brace, and was planning to follow up with Dr. Guyot. (*Id.*) He also stated his leg pain was "much improved." (*Id.*) Dr. Atty's physical examination results and impression remained the same. (*Id.*) Dr. Atty's treatment plan was to discontinue the Oxycontin, take Vicodin, follow up with Dr. Guyot, and follow up with Dr. Atty in one month. (*Id.*) At his October 11, 2004 visit, Plaintiff said his

13

lower back pain and left leg pain had increased, that the Vicodin was not controlling it, and that

he wanted to try Oxycontin again. (*Id.*) Dr. Atty's general examination results and impression

were the same, and he modified the treatment plan to resume a lower dose of Oxycontin, and

gave Plaintiff samples of Ultracet for breakthrough pain. (*Id.*)

At the October 29, 2004 visit, Plaintiff had an increase in back and left leg pain which

caused him to increase his Oxycontin use and run out sooner. (Tr. at 280.) He also complained

of problems sleeping at night. (*Id.*) His work at the time consisted of driving long distances and

this was increasing his pain. (*Id.*) He still had not followed up with Dr. Guyot and he denied

any other symptoms. (*Id.*) Dr. Atty noted that lumbar motion was difficult to assess with the

brace, that Plaintiff had "some pain on straight leg raising of the left[,] . . . [m]aybe some

decreased sensation in the S1 distribution different than before[,] but otherwise no change."

(*Id.*) Dr. Atty's impression remained the same and his treatment plan was to continue the

Oxycontin, increase the Neurontin, start Plaintiff on Lodine, and have Plaintiff "[f]ollow up

with Dr. Guyot soon and follow up with me in one month." (*Id.*)

At his November 22, 2004 visit Plaintiff complained of "significant lower back pain and

left leg pain," had not yet followed up with Dr. Guyot, was still wearing his brace, and was

tolerating his medication. (Tr. at 281.) The general examination showed a "positive straight leg

raising on the left [and] . . . [o]therwise[] no change in strength, reflexes or sensation"; the

treatment plan was to continue the Oxycontin, and Lodine, use the Neurontin only at night, to

follow up with Dr. Guyot, and to follow up with Dr. Atty in one month. (*Id.*)

Plaintiff did not see Dr. Atty again until October 25, 2005. (Tr. at 282.) At this visit he

stated he had "good relief" with the lumbar epidural injection he had received at the

14

recommendation of Dr. Guyot. (*Id.*) He was still limited in his activity and he still complained of pain, numbness, and weakness in the left leg. (*Id.*) Dr. Atty noted that he still had "positive straight leg raising on the left"; that his lumbar motion was "moderately limited in flexion, moderate to severe in extension and lateral bending"; and that he had "weakness in the left plantar flexion and manual muscle testing, and especially on toe-standing." (*Id.*) Dr. Atty's impression was "[c]hronic lower back pain secondary to left S1 radiculopathy, status post lumbar fusion." (*Id.*) His treatment plan was to "continue home exercise program" and to "avoid any lifting more than 15 pounds [and] no repetitive bending or twisting." (*Id.*)

On February 16, 2007, Plaintiff saw Dr. Paul LaClair for an independent medical evaluation regarding his "chronic low back and leg pain." (Tr. at 380-82.) Dr. LaClair's impression was that after his surgery, Plaintiff unfortunately "developed postoperative fibrosis on the left side at L5 resulting in chronic left L5 radiculopathy," and that he has "evidence of sacroilitis."  (*Id.*) Dr. LaClair stated that Plaintiff would "not likely benefit from further surgical intervention for postoperative fibrosis," he "require[d] continued use of analgesic medications," had "significant activity restrictions," he "should not lift more than 10 pounds," he "should be allowed to maintain a sit/stand option," he was unable to "carry more than 10 pounds" because he walks with a cane, he "should avoid repetitive bending, stooping or twistings, and that "[t]hese restrictions are permanent." (*Id.*)

Plaintiff's next visit with Dr. Atty was not until September 13, 2007. (Tr. at 283-86.) Plaintiff said that the 2005 back surgery had helped at first, but the pain had returned and was now a 9 to 10 out of 10 at worst and a 4 to 5 out of 10 at best. (*Id.*) He explained that his pain was aggravated by "driving, standing, vacuuming, sweeping, holding any prolonged position,

lifting, bending and twisting." (*Id.*) His pain was alleviated by "lying down, lying on his side, heat and medications." (*Id.*) He had not found the injections to be very helpful, he was not able to tolerate therapy, water aerobics were "of significant benefit," and he owned a TENS unit but it was of little benefit. (*Id.*) He could not use Naprosyn or Motrin because he had donated . (*Id.*) He was currently on Methadone, Neurontin, and Cymbalta. (*Id.*) He had previously tried Zoloft for depression but it had not worked for him. (*Id.*) At the time of the visit, Plaintiff smoked a pack of cigarettes a day, weighed 230 pounds, denied drinking alcohol, denied any illicit substance abuse, did not exercise, did not need help with heavy lifting, did not need help with household chores, and was driving himself. (*Id.*) Plaintiff was sleeping poorly because of pain; was having sadness and depression which was "poorly controlled with his medication"; and he denied suicidal or homicidal ideation, erectile dysfunction, saddle anesthesia, "unplanned weight loss, fevers, chills, frequent headaches, visual changes, chest pain, shortness of breath, nausea, vomiting, reflux, heartburn, constipation, blood in stool, bleeding disorder, urinary frequency, difficulty urinating, rash, swollen joints," and poor appetite. (*Id.*)

Dr. Atty did a neuromusculoskeletal exam which showed "head forward posturing with increased cervical lordosis and increased lumbar lordosis." (*Id.*) There was "no appreciable change to his thoracic kyphosis," his shoulder heights and iliac crest heights were "roughly equivocal," there was no kyphoscoliosis, and there was "hypertonic paraspinal musculature in the lumbar spine bilaterally. (*Id.*)

Dr. Atty also did range of motion testing, which showed lumbar flexion limited by back pain, "increased pain along the paraspinal tender points," limited rotation and lateral flexion, and "[f]acet loading with extension on rotation bilaterally caus[ing] increase in tender points."

16

(*Id.*)  He also noted that "[m]anual muscle testing bilaterally with hip flexion [was] 4/5," that "[m]anual muscle testing reveal[ed] 5/5 strength bilaterally with knee extension, knee flexion, dorsiflexion and left extensor hallucis longus strength was 5/5 and the right [was] 4/5," that the hip flexors had "give way weakness," that "[m]uscle stretch reflexes [were] 2/4 bilaterally at biceps, triceps, brachioradialis, patellae and Achilles," that the "[p]lantar reflex on the right [was] down going and equivocal on the left," that the "[p]roprioception [was] decreased bilaterally in the great toe," and that "[c]oordination [was] intact to light touch bilaterally in the stocking-and-glove region." (*Id.*) Plaintiff was still ambulating with a cane, had a normal base of support, was using the cane appropriately, and had a "symmetric step length with somewhat decreased stride length." (*Id.*)

Both sitting straight leg raising and supine straight leg raising tests "produce[d] pain with radiation on the right side as well as significant increase in pain in the L4-L5 paraspinal region." (*Id.*) A "Patrick's test produce[d] increased pain of the L4-L5 paraspinal region," but not over the sacroiliac joints bilaterally. (*Id.*) The Piriformis test was "negative for pain on palpation of piriformis muscle," the internal rotation of the hip did not produce "increased pain over the greater trochanters bilaterally," and reverse straight leg raising produced "increased pain over the L4-L5 paraspinal musculature." (*Id.*)

Dr. Atty's impression at this visit was that Plaintiff's "chronic lower back pain . . . [and] [h]istory of L5-S1 fusion . . . seem[ed] to be . . . consistent with facet syndrome." (*Id.*) His treatment plan was to get an MRI of the lumbar spine, get "[f]lexion/extension x-rays of the lumbar spine to rule out spondylolisthesis," to increase Cymbalta, to continue the Methadone, to increase the Neurontin, to try an aquatic exercise program, and to follow up in one month.

17

(*Id.*) Dr. Atty also discussed with Plaintiff "the risks and benefits of short and long acting narcotic pain medication, and the possibility of addiction, tolerance and withdrawal." (*Id.*)

Plaintiff visited Dr. Atty again on October 9, 2007 complaining about the same pain; he was still limiting his activity and walking with a cane, he was unsure if the increased Cymbalta was helping enough, he was "still feeling depressed from his chronic pain and limitation," and he was "working on starting aquatic exercises." (Tr. at 288.) Dr. Atty noted that the September 19, 2007 MRI, *see* (Tr. at 329), "showed L5-S1 post-op changes, bilateral neural foraminal narrowing L4 to S1 mildly effacing the L4-L5 nerve root" and "x-rays of the lumbar spine in flexion and extension showed no spondylolisthesis or instability." (*Id.*) The general exam showed "no acute distress," stable vital signs, that "[l]umbar spine motion [was] still very limited and painful," and that there was "[n]o change in strength, reflexes or sensation." (*Id.*) His impression was "[c]hronic lower back pain, L5-S1 fusion and facet syndrome," that the "MRI showed neural foraminal narrowing," and that the "[f]lexion/extension x-ray showed no spondylolisthesis." (*Id.*) The treatment plan was to continue the Methadone and Neurontin, increase the Cymbalta, follow up with Dr. Hak, consult a psychologist for depression, start aquatic exercise classes, and follow up in one month. (*Id.*)

At his November 5, 2007 visit, Plaintiff was still complaining of back and left leg pain, was noticing "some improvement in activity and walking" and in mood with the increase in Cymbalta, was still feeling depressed from "chronic pain and limitation," and was still having trouble sleeping at night. (Tr. at 289.) After a physical examination, Dr. Atty noted no difference except that Plaintiff seemed to be in a better mood; his impression was unchanged, and his treatment plan was unchanged except to consider a sleep study. (*Id.*) At his December

18

3, 2007 visit Plaintiff was complaining of same symptoms, had still not seen a psychologist, had begun aquatic exercises twice a week, was trying to walk more, and had begun a testosterone supplement for his hypogonadism. (Tr. at 290.) Dr. Atty's physical exam was the same except he noted that "[l]umbar spine motion seem[ed] to be less limited and less painful," and that Plaintiff "seem[ed] to be walking more upright and less antalgic with the cane." (*Id.*) Dr. Atty's impression and treatment plan did not change. (*Id.*) Nothing changed on the December 26, 2007 visit except Plaintiff was noticing improvement in fatigue and was started on Zanaflex to improve sleep. (Tr. at 291.) At his January 23, 2008 visit nothing had changed except he stopped taking the Zanaflex because it made him feel foggy and he was switched to a different Methadone because his tablets had been taken off the market. (Tr. at 292.) There were no changes in Plaintiff's February 20, 2008 visit; he just needed refills on his medicines. (Tr. at 293.)

On his March 19, 2008 visit, Plaintiff reported a recently noticed "significant increase in lower back pain on the left side with increase in radicular pain in his left leg," which "seem[ed] to be aggravated by activity." (Tr. at 294.) Dr. Atty's physical examination was the same except "[l]umbar spine range of motion seem[ed] to be painful and limited in extension and rotation, especially to the left side," there was "[p]ositive straight leg raising on the left," and "[o]therwise, no change in strength, reflexes or sensation." (*Id.*) Dr. Atty's impression was the same and his treatment plan was modified to discontinue the Neurontin because it was making Plaintiff feel drowsy, to begin Lyrica, and to consider "lumbar facet injection under fluoroscopy for therapeutic and diagnostic reasons." (*Id.*) Plaintiff's April 15, 2008 visit was the same except Dr. Atty discontinued the Lyrica. (Tr. at 295.)

On April 17, 2008 Plaintiff received a "lumbar facet injection under fluoroscopy" for the diagnosis of "[l]ower back pain secondary to facet syndrome." (Tr. at 296.) At his May 13, 2008 visit Plaintiff noted he had "some relief [from] the right lumbar facet injection but he missed his appointment for the left" injection because of an illness. (Tr. at 297.) Dr. Atty's physical examination had the same results as Plaintiff's last visit and his impression remained the same; Dr. Atty's treatment plan also remained the same except Plaintiff added Baclofen, the left lumbar injection was to be rescheduled, and an EKG was to be taken because of long term methadone use. (*Id.*) Plaintiff was also given a "guide for chronic pain patients." (*Id.*) Plaintiff received his second injection on May 28, 2008, (Tr. at 298), but did not report noticing much relief from it at his June 9, 2008 appointment. (Tr. at 299.) Besides Plaintiff inquiring about other treatment options or surgery, complaining about increased limitation in walking for exercise, and Dr. Atty consulting with a neurosurgeon for possible surgery or a spinal stimulator and a psychologist about Plaintiff's "active depression due to chronic pain," there were no changes in this visit. (*Id.*)

Plaintiff's next visit, on June 19, 2008, was sooner than normal because of "increase[d] left thoracic back pain without any exacerbating episode," which "seem[ed] to be worse with twisting, standing or bending." (Tr. at 300.) Dr. Atty examined Plaintiff's thoracic spine and noted "[t]enderness over the spine," Plaintiff stood in "somewhat of a flexed posture," there was "[l]eft mid to lower thoracic paraspinal tenderness and tightness," there was an "[i]ncrease in pain with extension/rotation to the left," and there was [t]enderness over the rib area." (*Id.*) Plaintiff's "[l]umbar spine range of motion remained the same. (*Id.*) Dr. Atty's modified his

20

impression to include "[t]horacic pain, most likely myofascial or facet syndrome; he also added a Flector patch to Plaintiff's treatment plan (*Id.*)

At his July 7, 2008 visit, Plaintiff complained of increased back pain, more limitation with activity, a "somewhat depressed" feeling, and continued difficulty sleeping at night. (Tr. at 301.) He expected to meet with a neurosurgeon in August and was seeing a psychologist. (*Id.*) Dr. Atty's physical examination yielded the same result as before, but he modified his impression as follows: "[c]hronic lower back pain, L5-S1 fusion and facet syndrome. MRI showed neural foraminal narrowing. Flexion/extension x-ray showed no spondyloslisthesis." (*Id.*) Dr. Atty also increased Baclofen, and recommended scheduling a sleep study to rule out sleep apnea. (*Id.*) There were no changes on Plaintiff's August 7, 2008 visit except that he had participated in a sleep study, was diagnosed with sleep apnea, and was advised to follow up with the sleep clinic regarding using a CPAP machine at night. (Tr. at 302.) There were no changes on Plaintiff's September 4, 2008 visit except that he had a follow-up scheduled with the sleep clinic to assess night use of a CPAP machine and another MRI was ordered. (Tr. at 304.)

On September 18, 2008 Plaintiff had an MRI for "[l]ow back pain and surgery," to "[e]valuate for stenosis," which showed a "[m]ild bilateral foraminal narrowing at L-5 and L5-S1 . . . [f]usion and decompressive laminectomy at L5-S1 . . . and [m]ild disc bulging at L4-5." (Tr. at 329.)

The weekend before his October 1, 2008 visit, Plaintiff had to go to the ER for withdrawal from Methadone–Plaintiff depleted his pills early because he had taken extra pills when he became nauseous and had a difficult time not vomiting up the pills. (Tr. at 305.) At the

21

appointment, Dr. Atty spoke with Plaintiff about not taking any more Methadone than

prescribed and added Rozerem to Plaintiff's medication. (*Id.*) There were no changes at

Plaintiff's October 27, 2008 visit except that Plaintiff had been "unable to see" Dr. Shah for a

scheduled appointment and he still had not followed up with the sleep clinic. (Tr. at 307.)

Before Plaintiff's November 18, 2008 visit he had an "incident where he twisted and

fell" and had increased his Methadone to compensate; he ran out of his medicine early as a

result. (Tr. at 309-10.) Plaintiff also stopped seeing his psychologist, had not rescheduled his

appointment with Dr. Shah, was scheduled for a repeat sleep study, had stopped taking his

testosterone replacement from Dr. Hak, and only taken the Neurontin periodically because of

side-effects. (*Id.*) Dr. Atty modified Plaintiff's Methadone, increased his Baclofen, advised

Plaintiff to resume visiting a psychologist, started Testim for testosterone replacement, and had

a discussion about not increasing Methadone without consulting with the pain clinic. (*Id.*)

At his December 2, 2008 visit, Plaintiff had been told by Dr. Hak that he had congestive

heart failure, had repeated his sleep study, (Tr. at 235), had not increased his Baclofen dose as

instructed, and had not yet noticed a difference with the testosterone therapy; Dr. Atty's

treatment plan did not change. (Tr. at 311-12.) At the December 29, 2008 visit Plaintiff had

participated in a repeat sleep study and was being fitted for a CPAP machine, reported increase

in depression, and Dr. Atty added a plan to consult with a psychiatrist and to increase the

Baclofen to Plaintiff's treatment plan. (Tr. at 313-14.) There were no changes at Plaintiff's

January 27, 2009 visit except Plaintiff reported sleeping a little better and  had not yet been

fitted for a CPAP because "they [were] having some difficulty." (Tr. at 315.) For his February

17, 2009 visit, Plaintiff still had not been fitted for the CPAP machine or followed up with the

sleep clinic, was following up with Dr. Hak "for his medical issues," was having a "work up,"
had started following the prescribed dose for the Baclofen, and had lost about 20-25 pounds
since starting the testosterone replacement therapy. (Tr. at 317.) At his March 10, 2009 visit he
had resumed aquatic exercises and had noticed some improvement sleeping at night–he still
needed to follow up with the sleep clinic. (Tr. at 319.) There were no changes at his April 9,
2009 or his May 7, 2009 visits. (Tr. at 321, 322.) At his June 1, 2009 appointment Plaintiff
reported having problems with his CPAP machine and had not yet followed up with the sleep
clinic; Dr. Atty continued his treatment plan and instructed Plaintiff that it was important to
follow up with the sleep clinic considering his sleep apnea. (Tr. at 323.) Plaintiff did follow up
with the sleep clinic by his June 30, 2009 appointment and was waiting for insurance to
approve his CPAP machine. (Tr. at 324.) He also had reduced his Baclofen to once or twice a
week as needed. (*Id.*)

        At his August 25, 2009 appointment, Plaintiff complained that he had "noticed
worsening in his activities of daily living," had a "significant increase in back pain even
working with restrictions[,] . . . had episodes of increase in depression and anxiety" for which
he wanted treatment, was still taking Cymbalta as prescribed, wanted a second opinion from
the Cleveland Clinic, and denied suicidal thoughts. (Tr. at 325.) Dr. Atty's treatment plan was
modified to consult with the Cleveland Clinic and to increase the Lyrica; he also noted that
Plaintiff should "[c]ontinue off work until further evaluation." (*Id.*) At his September 22, 2009
visit, Plaintiff noticed "some decrease in back pain now that he is not working." (Tr. at 338.)
He also noted a slight improvement in his depression. (*Id.*) At his October 20, 2009 visit,
Plaintiff noted that he missed his epidural injection because of a scheduling

miscommunication, that he had "slight improvement in his depression and anxiety,"and he had been following up with his counselor (Tr. at 340.) On November 6, 2009 Plaintiff received epidural steroid injections. (Tr. at 342.) At his November 16, 2009 appointment, Plaintiff was referred to the University of Michigan for a second opinion because his insurance would not cover a consultation with the Cleveland Clinic; also Plaintiff noted that the injection only helped his pain for a day or two. (Tr. at 343.) On December 10, 2009 Plaintiff received another epidural steroid injection. (Tr. at 345.) At his December 15, 2009 visit, Plaintiff noted that his depression was improving slightly and that he had "started following up with his counselor." (Tr. at 336.)

On Plaintiff's January 14, 2010 visit, he noted that his depression and anxiety seemed to be getting a little better and that he had quit smoking. (Tr. at 348.) There were no changes in his February 11, 2010 appointment except that he had noticed a slight improvement in his sleeping. (Tr. at 350.) There was no change at his March 11, 2010 appointment. (Tr. at 352.) The only change in his April 12, 2010 appointment was that he tripped and fell "with some left foot weakness and some increase in pain." (Tr. at 354.) At his May 11, 2010 appointment, Plaintiff reported that he had been hospitalized for bowel adhesions and that Dr. Hak had started him on testosterone replacement again. (Tr. at 356; *see also* Tr. at 360, 366.) There was no change for Plaintiff's August 3, 2010 visit. (Tr. at 346.)

Dr. Kazem Hak submitted treatment records for the following dates: August 28, September 28, and November 29, 2007; February 29 and December 2, 2008; January 5 and May 11, 2009; and May 5, 2010. (Tr. at 251, 250, 248, 247, 245, 243, 241, 360.) He also

included copies of Plaintiff's December 1, 2008 Sleep Study at Mid-Michigan Sleep Center and Plaintiff's September 23, 2010 University of Michigan consultation. (Tr. at 362, 235.)

On August 28, 2007, Dr. Hak examined Plaintiff and noted that his general appearance was well nourished, pleasant, that he was overweight, that he was alert and oriented times three, and that he was in no acute distress; that for his heart, "PMI normal, fifth intercostal space . . . [r]ythm RRR . . . heart sounds normal," no clicks, and no murmurs; that for his chest the shape and expansion were normal, the chest wall was non tender, the breath sounds CTA were normal, the percussion was normal, there were no rales, and there were no wheezes; that for his abdomen the shape was normal, the inguinal nodes were not enlarged, there were soft, non tender scars from a previous laparotomy, hernia was absent, there was no tenderness, guarding, or masses, and the liver and spleen were not palpable; for his extremities there were no tremors or onychomycosis, his sensation was intact, "pulses 2+ bilateral," and there was no clubbing, cyanosis, or edema. (Tr. at 251-52.) Dr. Hak's assessment was "back pain, depression, and hypertension; his treatment plan was to continue Methadone for pain, start Cymbalta for depression, and start Dynacirc for hypertension.

Plaintiff saw Dr. Hak again on September 28, 2007 for cold symptoms and was started on Clarinex; he had not started testosterone treatment for hypogonadism yet because Dr. Hak was waiting on bloodwork. (Tr. at 250.) Plaintiff saw Dr. Hak on November 29, 2007 for a follow-up visit regarding hypogonadism; Plaintiff had not used the Androgel prescription yet because of cost so Dr. Hak stopped that treatment and advised a follow up in three months. (Tr. at 248.) Plaintiff visited Dr. Hak on February 29, 2008 complaining of problems sleeping. (Tr. at 247.) Dr. Hak's assessment at this visit was hypogonadism, hypertension, insomnia, and

25

tobacco use disorder; he increased the Lotensin for the hypertension, started Plaintiff on Soma for the insomnia and Chantix for the tobacco use disorder, and recommended a follow-up visit in three months. (*Id.*)

Plaintiff returned on December 2, 2008 for a check up. (Tr. at 245-46.) Plaintiff's general appearance had changed from overweight to obese. (*Id.*) Dr. Hak's assessment was hypertension, hypogonadism, shortness of breath, tobacco use disorder, and congestive heart failure; his treatment plan was to take labs for they hypertension, an echocardiogram for the shortness of breath, start Chantix for the tobacco use, and start Toprol, Lisinopril, and Lasix for the congestive heart. (*Id.*) There were no relevant changes at his January 5, 2009 appointment. (Tr. at 243.)

At Plaintiff's May 11, 2009 appointment he had been having extreme difficulty sleeping. (Tr. at 241.) Dr. Hak assessed him with nocturia, hypogonadism, hypertension, sleep apnea, and benign prostate hyperplasia ("BPH"); Dr. Hak kept his treatment plan the same except he refilled Plaintiff's Testim prescription for the hypogonadism and began him on Flomax for the BPH. (*Id.*)

On May 5, 2010, Plaintiff saw Dr. Hak about questions related to his hospitalization for bowel obstruction and adhesions and was advised to increase his Miralax powder. (Tr. at 360-61, 365-68.)

On September 23, 2010,[3] Plaintiff went to the University of Michigan Health system for a consultation with Dr. Frank La Marca. (Tr. at 362-64.) Plaintiff told Dr. La Marca that his back and leg pain was "periodic in nature," and that "sometimes it is resolved." (*Id.*) He also

---

[3] Plaintiff's last insured date was December 31, 2009. (Tr. at 20-21.)

reported that "up until approximately one month ago, he had gone an entire year with no leg pain." (*Id.*) He also reported that "almost all activities make his symptoms worse, [such as] walking, mowing grass, raking, sitting for prolonged periods of time." (*Id.*) He said he used his cane "from time to time," and did periodic stretches. (*Id.*) At this visit, Plaintiff had "full strength throughout all four extremities at 5/5," his gait was steady, he had "positive back pain with straight leg raises bilaterally at 60 degrees on the right and 45 degrees on the left," and neither his right or left "lateral hip rotation" produced any pain.

### 2.     Plaintiff's Function Report and Testimony at Administrative Hearing

In his Function Report Plaintiff said that on a typical day he wakes up, stretches his back, makes his wife's lunch and a small breakfast, reads his bible and tries to get house work done. (Tr. at 147.) He feeds, waters, and exercises pets; takes care of his personal needs; prepares his own meals and many of his wife's meals; does laundry, cleans dishes, makes beds, does some ironing, but is unable to rake, mow or vacuum because of twisting; walks every day, sometimes drives if he has had a decent amount of rest, usually can go out alone, and does the household grocery shopping since the store is only three blocks away. (Tr. at 146-57.) His current hobbies include woodworking, wood carving, and wood burning; he has had to give up woodworking on larger projects, fly fishing, and coaching little league baseball. (*Id.*) He really only spends time with his wife and children and does not go out. (*Id.*) Plaintiff says he can walk about 3/4 of a mile before he needs to rest about five minutes. (*Id.*)

At the administrative hearing, Plaintiff testified that nothing had changed from the last date insured, December 31, 2009, and the time he filled out the Function Report on June 3, 2010. (Tr. at 46.) He said his "health has not changed in basically five years." (Tr. at 47.) He

27

said that the main thing that was preventing him from working was the back pain from the surgery and that the pain went from his lower back to his left leg. (Tr. at 50.) He said that twisting really agitates the back pain, that taking naps helps his pain, and that he had about four bad days and three good days in the average week.  (Tr. at 53-55.)

### 3.   Vocational Expert Testimony at Administrative Hearing

At the administrative hearing, the ALJ asked Timothy Shaner, the vocational expert ("VE"), to consider a hypothetical individual with the same age, education, and work experience as Plaintiff who:

> would be able to perform work at the sedentary level, which is lift up to ten pounds occasionally, stand and walk for about two hours and sit for up to six hours in an eight-hour work day with normal breaks.
>
> This individual would be allowed to sit or stand alternatively, provided they were not off-task more than 10 percent of the work period.
>
> They could never climb ladders, ropes, or scaffolds. They could occasionally climb ramps or stairs. They could occasionally balance, stoop, kneel, crouch, and crawl. This individual would have to avoid all exposure to excessive vibration, avoid all use of moving machinery, [and] avoid all exposure to unprotected heights.

(Tr. at 63.) The VE responded that such a person could not return to any of Plaintiff's prior work but could perform the estimated 4400 sedentary unskilled jobs available in Michigan of assembler, packager, or inspector. (Tr. at 63-64.)

The ALJ then asked two more hypothetical questions exactly the same as the first, except that the individual would be off task twenty percent of the time in the second and thirty percent of the time in the third. (*Id.*) The VE said that there would not be any jobs available in the national economy for the hypothetical individuals from questions two and three–he confirmed that they might be able to get a job, but they would not be able to sustain employment. (Tr. at 64-65.) The

ALJ determined that the VE's testimony was "consistent with the information contained in the Dictionary of Occupational Titles." (Tr. at 28.)

### F.    Analysis and Conclusions

### 1.    Proper Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 27.)

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Supported by Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 8 at 1.)  As indicated above, if the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g);  *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff argues that the ALJ's hypothetical did not accurately portray Plaintiff's impairment because he did not properly assess Plaintiff's credibility or properly evaluate the "medical records of evidence." (Doc. 8 at 6.)

    **a.**    **Medical Sources, Plaintiff's Credibility, and the RFC**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. "Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-3p, 2006 WL 2329939, at *2 (2006).

The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the

impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue these opinions the regulations deem them to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Certain determinations, such as whether a claimant meets the statutory definition of disability and how to measure a claimant's residual functional capacity, are not "medical opinions" and are exclusively made by the Commissioner." *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from non-treating acceptable sources, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(c).

"The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3).  "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

Certain opinions of a treating physician are entitled to controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are

"not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. A treating source is a physician the claimant sees "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502.

The only opinions that have controlling weight deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, an ALJ is not bound by a treating source's opinion on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[,] [including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[4] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Because of the special status of treating source opinions, where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error." *Cole v. Comm'r of Soc. Sec.,* 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)). But this error is not always dispositive and can be considered "harmless error" if: "(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) the Commissioner adopts the opinion of the treating source or makes findings

---

[4] The Commissioner's power to determine a claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [a claimant] can still do despite [any] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d)(2) . . . even though she has not complied with the terms of the regulation." *Cole*, 661 F.3d at 940 (quoting *Wilson*, 378  F.3d at 547).

After treating sources, a "nontreating source, who physically examines the patient 'but does not have, or did not have an ongoing treatment relationship with' the patient, falls next along the continuum." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). "'The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 F. App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

Finally, the social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Finally, the ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(I)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. The claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

A claimant must provide evidence to establish his or her RFC. The statute lays the groundwork for this, stating, "[a]n individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence . . . as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [a claimant] can still do despite [the] limitations," and is determined using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The hypothetical is valid if it

34

includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

      **b.**      **Analysis**

      Plaintiff attacks the ALJ's findings for distorting his limitations in the RFC. The precise targets of this criticism, however, are difficult to discern. Plaintiff opens with a protracted description of the rules surrounding the credibility analysis and also the requirement that the ALJ's hypothetical accurately describe the claimant. (Doc. 8 at 6-9.) He then shifts to recount his testimony and medical records in an attempt to prove the ALJ's findings diverged from the evidence. (*Id.* at 10-11.) But quoting his own testimony of subjective pain and the medical impressions of physicians merely proves that his pain arose from diagnosable maladies. (*Id.*) Claimants must do more: they must show that the medical condition impairs them from participating in substantial gainful activity. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition.").

      In addition to reiterating Plaintiff's testimony regarding his subjective pain, Plaintiff points to the fact that on February 16, 2007 Dr. LaClair restricted him to not lifting more than ten pounds and to avoid repetitive bending and lifting. (Doc. 8 at 12; *see also* Tr. at 380-82.) On October 25, 2005 Dr. Atty also restricted Plaintiff to not lifting more than fifteen pounds, but Plaintiff does not mention this restriction in his brief. (Tr. at 282.) More importantly, however, Plaintiff fails to show how these restrictions, coupled with his subjective complaints of pain, amounted to an invalid hypothetical. All he does is state that "each element of the

hypothetical does not accurately describe Jonathon Fisk in all significant, relevant respects," and therefore the "VE's testimony should not constitute substantial evidence."

The hypothetical was based on the RFC and is valid because it includes all the credible limitations. *See Casey*, 987 F.2d at 1235. The ALJ first confirmed that objective medical evidence of the underlying condition existed by giving great weight to the opinions of Dr. Atty and Dr. LaClair. The ALJ noted that "[o]bjective evidence does show a severe back problem, that has caused pain in the claimant's back and left leg. (Tr. at 25.) He considered Dr. Atty's assessment of "chronic lower back pain secondary to left S1 radiculopathy in 2004" and to Dr. LaClair's opinion that Plaintiff "had likely developed postoperative fibrosis on the left side at the L5 level resulting in chronic left L5 radiculopathy, and required continued use of analgesic medications. (*Id.*) The fact that Dr. Atty restricted Plaintiff to 15 pounds and Dr. LaClair restricted him to 15 pounds and the similarity in their assessments demonstrated that both opinions were consistent with each other, so the ALJ afforded them both "great weight." (Tr. at 25-26.) The ALJ also considered the September 2007 x-ray that confirmed degenerative disc disease and the pain and limited range of motion that Plaintiff showed during physical examinations with Dr. Atty. (Tr. at 26.) All this objective evidence showed that Plaintiff had an underlying condition of degenerative disc disease, status/post fusion of the lower spine, and obesity, that could "reasonably be expected to produce the claimant's pain or other symptoms." (Tr. at 22, 24.)

With this objective evidence in hand, the ALJ moved on to the second step of the two-step process for evaluating subjective symptoms of pain, whether the condition could reasonably be expected to produce the alleged pain or whether the other objective evidence

verified the severity of the pain. *See* C.F.R. § 404.1529; SSR96-7p, 1996 WL 374186, at *2. The ALJ first determined that, because the "intensity, persistence, or functionally limiting effects" of Plaintiff's pain were "not substantiated by objective medical evidence," he must undertake a separate assessment of the credibility of the Plaintiff's statements. The ALJ noted that in "January 2009, the claimant reported improvement with activity and walking[,] [and that] [p]rogress notes document that he was tolerating his medications well, without any reported side effects." (Tr. at 26.) The ALJ also noted that at the May 2009 visit Plaintiff "stated that he could complete his activities of daily living with only minimal difficulty, and in June 2009 he reported that aquatic exercises were helping." (*Id.*) The ALJ looked to the fact that in December 2009, "the claimant reported continuing back pain and radicular pain, with occasional numbness and weakness in the left leg, although he demonstrated 'less pain on straight leg raising on the left.'" (*Id.*)

From all of this, the ALJ found "the objective medical evidence and medical treatment persuasive in determining that the claimant's allegations, before the date last insured, were not as severe as alleged." (*Id.*) At this time the ALJ also looked at Plaintiff's visit to Dr. La Marca in September of 2010. The ALJ noted that this was after the last date insured, but found that Plaintiff's statement that he had "gone 'an entire year' with no pain in his legs" was relevant because that would mean he had not had pain in his legs since September of 2009, which would be before the date last insured of December 31, 2009. (*Id.*) The ALJ also noted that claimant testified in his hearing that he used his cane all of the time, but at his visit with Dr. La Marca he said he only used his cane intermittently. (*Id.*)

37

The ALJ therefore had to assess the plaintiff's credibility and found Plaintiff only partially credible:

> Careful consideration has been given to the claimant's statements regarding alleged s[ymptoms] and their effect on functioning. Claimant alleges nerve pain from back to le[g]. The MDIs could reasonably be expected to produce the alleged s[ymptoms], but the intensity and their impact on functioning are not consistent with the totality of the evidence. Specifically, [Plaintiff] states that he does not rake or vacuum due to having to twist, but does laundry, loads/unloads dishwasher, makes bed and irons. [He] [s]tates that s[ymptoms] are usually fine with alteration between sitting and standing, and . . . that he can walk 3/4 mile before needing just [a] 5 min[ute] rest, but states that he uses cane to ambulate. [He] [s]tates that he cannot stay in one place longer than 1.5 hours, but states he only gets between 1 and 4 hours of sleep per night.

(Tr. at 75.) The ALJ looked to Plaintiff's testimony at the administrative hearing and to the administrative record and considered all of the factors set forth in 20 C.F.R. § 404.1529 (c) when assessing Plaintiff's credibility. Therefore the ALJ's credibility assessment and disability assessment was supported by substantial evidence.

### 3.     Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to

another party's objections within 14 days after being served with a copy." Fed. R. Civ. P.

72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver

of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950

(6th Cir. 1981). The parties are advised that making some objections, but failing to raise others,

will not preserve all the objections a party may have to this Report and Recommendation.

*Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit*

*Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich.

LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any

objection must recite precisely the provision of this Report and Recommendation to which it

pertains. Not later than 14 days after service of an objection, the opposing party may file a

concise response proportionate to the objections in length and complexity. Fed. R. Civ. P.

72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in

the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule

without awaiting the response.

Date:  July 28, 2014                                        /S PATRICIA T. MORRIS
                                                           Patricia T. Morris
                                                           United States Magistrate Judge